**LAWHEAD v. BRAST, Former United States Collector of Internal Revenue.**

District Court, N. D. West Virginia.
Feb. 21, 1936.

James R. Moreland, of Morgantown, W. Va., and Steptoe & Johnson and James M. Guiher, all of Clarksburg, W. Va., for plaintiff.

James W. Wideman, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., Arthur Arnold, U. S. Atty., of Parkersburg, W. Va., and Wm. C. Howard, Asst. U. S. Atty., for defendant.

BAKER, District Judge.

This is a suit brought originally by the Bank of the Monongahela Valley of Morgantown, W. Va., against Edwin A. Brast, former collector of internal revenue. After the institution of the suit, the bank was placed in the hands of a receiver, who was duly substituted as party plaintiff. By stipulation, the case was tried to the court without a jury.

No important facts in the case are in dispute, and are, very briefly, as follows: Within the time required by law, the Bank of the Monongahela Valley filed its income tax return for the years 1925 and 1926, and paid the amount of the tax shown to be due by said return. Subsequently thereto, the bank filed a claim for refund, basing said claim for refund upon the alleged fact that the original returns included among the assets of the bank certain notes and certain trade acceptances, which said notes and trade acceptances were, as a matter of fact, worthless and should have been considered as bad debts. The bank sought to justify this course of action by saying that, at the time the returns in question were filed, the general business conditions in and around Morgantown were such that the bank was afraid to have the public know its true condition, and for that reason, in effect, made a false statement in its income tax. As the suit was originally brought, the bank apparently relied upon section 214 (a) (7) of the Revenue Acts of 1924 and 1926 (43 Stat. 270, 44 Stat. 27), which were, in so far as they apply, as follows:

"In computing net income there shall be allowed as deductions: * * *

"(7) Debts ascertained to be worthless and charged off within the taxable year."

During the course of the trial, it was so overwhelmingly proven that these debts were not charged off within the taxable years in question that counsel for the bank virtually abandoned this position. In this connection, attention is called to the testimony of Mr. Tanner, the accountant for the bank who prepared the returns. He testified as follows: "Q. Mr. Tanner, state if you know, when the items that you have enumerated for the years 1925 and 1926 were actually charged off on the ledger of the bank. A. On the general ledger of the bank they were charged off November 17, 1928." Mr. Moreland, one of the directors and one of counsel for the bank, testified to the same effect. Mr. M. T. Sisler, former chairman of the board of directors, testified to the same effect, and Mr. McBee, former cashier, said: "Q. Was any notation placed upon any books or rec-

ord of the bank to show that the four 1926 items were regarded as losses in the year 1926, that is, placed upon the books in 1926? A. No, sir." It is also stated in the brief for the plaintiff: "The Bank's accountant was not informed of the 1925 and 1926 losses until they were finally reflected upon the Bank's general ledger on November 17, 1928." If the bank's accountant was unable to find any charge-off within the taxable years in question, it would seem conclusive that no charge-off had been made. Counsel in their brief did attempt to cite a few cases to the effect that the manner, or nature, of the charge-off is a secondary matter and not important, and in this connection cited the cases of Jones v. Commissioner (C.C.A.) 38 F.(2d) 550, and Stephenson v. Commissioner (C.C.A.) 43 F.(2d) 348. In the first of these cases, the plaintiff was the executor of an estate, and the proof showed that he kept no books whatever, except his bank book. In the Stephenson Case, also, no books whatever were kept. These cases are, therefore, in my opinion, of little value in the instant case. To say that, where a formal set of books complete enough to conduct the business of a bank in operation did not reflect any charge-off, the charge-off may be shown in some other manner, would in effect nullify that entire provision of the statute.

■ There are so many cases holding that, where bad debts are sought to be deducted and where any books at all are kept, the debts must in fact be charged off within the taxable year, that it seems fruitless to cite even a few of them. However, see United States v. Klausner (C.C.A.) 25 F.(2d) 608; Peoples Trust Co. v. Commissioner, 10 B.T.A. 1264; and E. W. Porter v. United States (C.C.A.) 27 F.(2d) 882.

■ Looking at this whole record, I think it is plain that the plaintiff was not entitled to a deduction from these loans claimed to be bad, upon the ground that they were "bad debts."

■ The plaintiff, however, has sought to justify these deductions upon the theory that they were losses. In this connection the plaintiff cites the case of Southern California Box Co. v. United States (D.C.) 46 F.(2d) 724, 726, and the case of Murchison National Bank v. Grissom (C.C.A.) 50 F.(2d) 1056, 1057, as authority for the proposition that all debts are losses. The plaintiff advances the contention that Judge

Northcott, in the Murchison National Bank Case, has so held, and that therefore any bad debt, even though not charged off during the taxable year, may be treated as a loss and deducted as such. I am unable to agree with the plaintiff that this is the correct interpretation of Judge Northcott's opinion.

In the Southern California Box Co. Case the plaintiff had entered into a contract with one A. D. Hill whereby the plaintiff was to advance him money and Hill was to construct a sawmill and repay the money advanced with lumber. Hill defaulted on his contract and fled the country. The plaintiff then sold the sawmill and applied the amount derived from such sale to its debts against Hill, and set up the balance as a bad debt. This balance was charged off the plaintiff's books. In that case the government contended that the transaction involved a loss rather than a bad debt, and that, under the statute, partial losses were not deductible. The court, however, held that the transaction constituted a matter which was deductible, but in reading the entire opinion it is apparent that the court treated it as having constituted a bad debt. It is true that the court used the following language, as quoted in the plaintiff's brief: "It is immaterial for the purposes of the case whether this balance is treated as a bad debt or as a business loss. All bad debts are losses."

But the court added: "although not always a business loss, nor are business losses always bad debts, but in this particular instance the balance owing from Hill to plaintiff was both a bad debt and a business loss."

The second quotation plainly shows that the court was considering the peculiar facts of that case and was treating the transaction as having given rise to a bad debt under the statute.

The Murchison National Bank Case, in which Judge Northcott cites the Southern California Box Co. Case with approval, involved facts of a very similar nature. In this latter case the plaintiff bank had loaned money to N. P. Sloan & Co.; said loan being secured by a certain amount of cotton in warehouses. The loan was charged off as a bad debt, and the bank credited against such loan the estimated value of the cotton held as security and deducted the balance from its income for that year. Here again the court treated the transaction as constituting a bad debt. It

is apparent from the opinion that the Circuit Court of Appeals so construed it; in fact, in the opinion Judge Northcott said: "The sole question here is whether, under the act, so much of a debt as is admittedly worthless may be deducted by the taxpayer."

For these reasons I feel that the Circuit Court of Appeals did not hold that all bad debts are at the same time "losses," but, on the contrary, held that under the peculiar circumstances of that case what might have appeared to be a loss was really a bad debt.

In the instant case no such circumstances existed. All of the deductions sought were because of negotiable paper held by the bank, treated by the bank on its books as "good and collectible," and in subsequent years found to be, in fact, worthless.

The plaintiff seeks to distinguish some of these items from the general rule because they constituted paper purchased by the bank and did not evidence loans made direct to the original borrower. However, in practically all instances, these notes were renewed after coming into the bank's possession and prior to the taxable years in which they are sought to be deducted as losses. This would apparently destroy the contention made by the plaintiff. However, even overlooking this, and even conceding that there might be some possible merit in the plaintiff's contention in this regard, there is nothing to show that, if a loss was sustained from these negotiable instruments, it was sustained in the years for which deductions are sought to be made. There was no attempt made to collect them in the years in question; they were not placed in the hands of attorneys for suit; and, as far as this record discloses, no attempt whatever was made by the bank to realize any money from them. The bank simply says that in 1928 they had proven to be worthless and that they knew they were worthless in 1925 and 1926. If this were a correct interpretation of the law, any one who held stock in corporations during the so-called "boom period," and who, after the stock market crash, was forced to sell the same at a loss, would have been entitled to come in and say that that loss could have been taken during any of the years prior to the drop in the market. To state this proposition shows its absurdity.

The plaintiff bank urged strongly at the trial of this case that it had advised the state banking department during 1925 and 1926 that these items, claimed to be losses in this suit, were really bad and uncollectible debts, and seeks by this to show that the bank was at that time treating them as losses. They also urged that the state banking commissioner advised them to set them up as bad debts and to take them out of the assets of the bank. However, the fact remains that this was not done, and the fact that the state banking commissioner did ultimately agree to treat these claims as good and collectible assets of the bank is proof that in the years in question the banking department, at least, considered that they had some value.

It is also of interest to note that witnesses for the bank, when asked why they did not rely upon the fact that the general public does not have access to income tax returns, or at least did not when these returns were filed, and so make a correct return, sought to explain their action by saying that it would have been necessary to reprint some calendars which they had had made showing the amount of undivided surplus and reserve, and to have changed signs upon the windows of the bank showing the amount of undivided surplus and reserve. This they said would have resulted in scaring the public. They, however, did not explain why they considered that it would have been their duty to the public to change their calendars and their advertisements, but still did not hesitate to print in the newspapers, as required by law, a sworn statement as to the bank's financial condition, which according to their contention was false.

█ In these cases the finding of the Commissioner is prima facie correct, and the bank must overcome that finding by a preponderance of the evidence. In the instant case I do not believe that the bank has even made out a prima facie case, let alone overcome the burden of proof imposed by law upon it.

For these reasons, an order will go entering judgment for the defendant.